United States District Court
Southern District of Texas

**ENTERED**

July 25, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MELODY L. SHOLARS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-15-1753 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is the Defendant's

Motion for Summary Judgment (Document No. 15) and Memoranda in Support

(Document Nos. 13, 14, & 15), Plaintiff's Response to Defendant's Motion for Summary

Judgment (Document No. 18), Memorandum in Support (Document No. 17), and

Response to Defendant's Cross-Motion for Summary Judgment (Document Nos. 16, 17,

& 18), and Defendant's Response in Opposition to Plaintiff's Motion for Summary

Judgment (Document No. 19). After considering the cross motions for summary

judgment, the administrative record, and the applicable law, the Magistrate Judge

ORDERS, for reasons set forth below, that Defendant's Motion for Summary Judgment

---

[1] On September 28, 2015 the parties consented to proceed before the undersigned
Magistrate Judge. (Document No. 11).

(Document No. 15) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 16) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I.    Introduction

Plaintiff, Melody L. Sholars ("Sholars"), brings this action pursuant to § 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381. *See* 42 U.S.C. § 405(g). Sholars argues that the final decision of the Commissioner denying her application for SSI is not supported by substantial evidence and did not comply with the relevant legal standards. Sholars claims that she has been disabled since December 24, 2010, due to compressed discs in her neck and severe arthritis in both knees.

According to Sholars, the Administrative Law Judge's ("ALJ") determination of her residual functional capacity ("RFC") is not supported by substantial evidence.  She further argues that the ALJ, Daniel E. Whitney, failed to adequately evaluate her credibility when he based the determination on his recitation of the treatment evidence, her ability to take care of her three minor children, and her reports that she quit work in 1994 to care for her children and then worked for only a few months in 2010. Sholars argues that those reasons and his discounting of the statements from her family are not sufficient to discount her credibility. Sholars requests that this Court reverse the ALJ's decision and award benefits, or in the alternative, remand for further administrative proceedings.

The Commissioner responds that there is substantial evidence in the record and the relevant legal standards were applied in the ALJ's determination of the Plaintiff's RFC and credibility, and that there is substantial evidence in the record to support the ALJ's decision that Sholars wasn't disabled and that the decision should therefore be affirmed.

## II.    Administrative Proceedings

On May 7, 2012, Sholars filed an application for SSI, claiming disability since December 24, 2010. Her claim stated that her disability consisted of arthritis in her knees and compressed disks in her neck. (Tr. 159-167). On September 10, 2012 the Social Security Administration denied her initial application finding her not disabled because her condition was not severe enough to keep her from working. (Tr. 72-82, 84). Sholars requested reconsideration on her claim, adding more medical evidence to the record, and on November 29, 2012 the Social Security Administration again determined Sholars was not disabled. (Tr. 85-96, 98).

On January 4, 2013, Sholars subsequently requested a hearing before the ALJ. (Tr. 114-116). The Social Security Administration granted her request and the ALJ held a hearing on December 12, 2013 in Houston, Texas. Sholars and Cheryl L. Swisher ("Swisher"), an impartial vocational expert ("VE"), appeared and testified. (Tr. 40-71). The Social Security Admission established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 419.920(a)).  On December 30, 2013 the ALJ issued his decision finding that Sholars is not disabled. (Tr. 7-25).

Sholars filed a request for review of the ALJ's decision on January 13, 2014. (Tr. 33-39). The Appeals Council will grant a request to review an ALJ's decision if any of

the following circumstances are present: (1) it appears that the ALJ abused his discretion;
(2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence
does not support the ALJ's actions, findings or conclusions; or (4) a broad policy issue
may affect the public interest. (20 C.F.R. § 404.970; 20 C.F.R. § 416. 1470). After
considering Sholars' contentions in light of the applicable regulations and evidence, the
Appeals Council, on April 6, 2015, denied the request.  (Tr. 1-6).  After this denial the
ALJ's findings and decision became final. Plaintiff now seeks judicial review under 42
U.S.C. § 405(g).  Both the Commissioner and Sholars have filed a Motion for Summary
Judgment (Document Nos. 16 & 15).  This appeal is now ripe for ruling.

III.    **Standard of Review**

The Court's review of the ALJ's denial of Sholars disability benefits is limited to
determining whether the decision is "supported by substantial evidence on the record as a
whole" and whether "proper legal standard [was applied]." 42 U.S.C. §§ 405(g), *see also
Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994) Indeed, Title 42, Section 405(g)
limits judicial review of the Commissioner's decision: "The findings of the
Commissioner of Social Security as to any fact, if supported by substantial evidence,
shall be conclusive."  The Act specifically grants the district court the power to enter
judgment, upon pleadings and transcript, "affirming, modifying, or reversing the decision
of the Commissioner of Social Security, with or without remanding the cause for a
hearing" when not supported by substantial evidence.  42 U.S.C. § 405 (g).  While it is
obligatory upon the court to examine the record in its entirety to decide whether the
decision is supportable, *Simmons v. Harris,* 602 F.2d 1233, 1236 (5th Cir. 1979), the
court may not "reweigh the evidence in the record nor try the issues de novo, nor

substitute [its] judgment for that of the [Commissioner] even if the evidence

preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F. 2d 340,

343 (5th Cir. 1988); *see also Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).

Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan,* 954

F. 2d 289, 295 (5th Cir. 1992).

Substantial evidence is defined as "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389,

401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

Substantial evidence means more than a scintilla, but less than a preponderance. *Johnson*,

864 F.2d at 343-44. A finding of no substantial evidence will be found only where there

is a "conspicuous absence of credible choices" or "no contrary medical evidence." *Id.*

## IV.    Burden of Proof

An individual applying for benefits bears the initial burden of proving that he or

she is disabled for purposes of the Act. *Johnson,* 864 F.2d at 344. The Act defines

disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven

through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. §

423(d)(3). The impairment must be so severe as to limit the claimant in the following

manner:

> He is not only unable to do his previous work but cannot, considering his
> age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or

> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of impairment is not enough to establish

that one is suffering from a disability.  Rather, a claimant is disabled only if he is

"incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293

(quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)). If the claimant proves

disability, the Commissioner then bears the burden of establishing that the claimant is

capable of performing substantial gainful activity and is not disabled. *Neal v. Bowen*, 829

F.2d 528, 529-30 (5th Cir. 1987).To determine whether claimant is disabled or not, a

five-step sequential procedure is applied to the claim as a whole and analyzed. *Johnson*,

864 F.2d at 344. If there is a finding that the claimant is or is not disabled at any point in

the five-step process is conclusive and the analysis is terminated. *Id.*

> The five-step sequential process to decide disability status is as follows:
>
> Step 1: If the claimant is presently working, a finding of "not disabled"
> must be made;
>
> Step 2: If the claimant does not have a "severe" impairment or
> combination of impairments, he will not be found disabled;
>
> Step 3:  If the claimant has an impairment that meets or equals an
> impairment listed in Appendix 1 of the Regulations, disability is presumed
> and benefits are awarded;
>
> Step: 4:  If the claimant is capable of performing past relevant work, a
> finding of "not disabled" must be made; and
>
> Step 5:  If the claimant's impairment prevents him from doing any other
> substantial gainful activity, taking into consideration his age, education,
> past work experience, and residual functional capacity, he will be found
> disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 (5th Cir. 1995);

*Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  In using this formula the claimant

bears the burden of proof on the first four steps of the analysis to prove a disability exists.

*Mcqueen v. Apfel,* 168 F.3d 152, 154 (5th Cir. 1999).   If the claimant is successful, the

burden then shifts to the Commissioner, at step five, to show that the claimant can

perform other work.  *Id.*  If the Commissioner demonstrates that there are other jobs

available to the claimant, the burden shifts, again, to the claimant to rebut this finding.

*Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the

Commissioner determines that the claimant is or is not disabled, the evaluation ends.

*Leggett,* 67 F.3d at 563.

        In the instant action, the ALJ determined, in his December 30, 2013, decision, that

Sholars was not disabled (Tr. 10-20). At the first step, the ALJ determined that Sholars

has not engaged in substantial gainful activity since May 7, 2012, the application date.

(Tr. 10). At the second step, the ALJ determined that Sholars had the following medically

determinable and severe impairments: degenerative joint disease in her right knee,

osteoarthritis of the left hip, cervicalgia, carpal tunnel syndrome by history, and obesity.

(Tr. 12). At the third step, the ALJ determined that Sholars did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1. (Tr. 14). After

considering the entire record as a whole, the ALJ found that Sholars had the RFC to: sit 6

hours in an 8-hour workday with normal breaks and sit/stand option every 15 minutes;

stand or walk 6 hours in an 8-hour workday with normal breaks and sit/stand option

every 15 minutes; lift or carry 20 pounds occasionally and 10 pounds frequently; and

push or pull 20 pounds occasionally and 10 pounds frequently. *Id.* Furthermore, the work may not require climbing ropes, ladders, or scaffolds but may occasionally include climbing ramps or stairs and the work is limited to frequent, but not constant gross handling and fine fingering. (Tr. 12). At step four, the ALJ found that Sholars is capable of performing her past relevant work as a data entry clerk. (Tr. 17). In the alternative, the ALJ found Sholars could perform other work existing in significant numbers in the national economy such as a general office clerk, a file clerk, or as a toll collector. *Id.* The ALJ concluded that the claimant has not been under disability as defined in the Social Security Act, since May 7, 2012, the date the application was filed. (Tr. 19).

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: 1) objective medical facts; 2) diagnoses and opinions of treating and examining physicians; 3) claimant's subjective evidence of pain and disability; and 4) claimant's age, education, and work history. *Wren,* 925 F.2d at 126.

## V.    Discussion

### a.    The Objective Medical Facts

The first factor considered in determining whether substantial evidence supports the ALJ's decision is the objective medical facts. The objective medical evidence shows that Sholars has been treated for degenerative joint disease in the right knee, osteoarthritis of the left hip, cervicalgia, carpal tunnel syndrome, and she is obese. (Tr. 12).

On March 30, 2011, an MRI, performed by H.J. Grainger, D.O., showed moderate central and bilateral paracentral disc protrusion with decreased signal in the disc consistent with chronic protrusion at C4-C5 and moderate central and left paracentral disc protrusion with decreased signal in the disc consistent with a chronic protrusion at C6-

C7. (Tr. 346-347). Dr. Grainger's impression was that there was Spondylosis at C4-5,
C5-6, and C6-7 with disc protrusions at all 3 levels. (Tr. 347). His impression further
stated that the C4-5 and C5-6 protrusions showed decreased signal suggesting old chronic
protrusions with increased signal in the disc left paracentrally at C6-7 suggesting a more
acute disc protrusion. (Tr. 347). An x-ray of the right knee showed mild
trichompartmental degenerative change, subchondral acelerosis, and marginal osteophyte
formation. (Tr. 344). It also showed that the bony alignment was within normal limits and
there was no fracture, dislocation or subluxation and no evidence of joint effusion. *Id.*
Imaging, done by Dr. Grainger, of Scholars' cervical spine on February 3, 2011 showed
C4-C5 and C5-C6 disc space narrowing. (Tr. 490). The remainder of her discs were of
normal height. *Id.*

On April 19, 2011, based on a new patient evaluation, treating physician David
Navid, D.O. diagnosed mild to moderate effusion in the right knee with very slight
diminished range of motion and pain. (Tr. 502). Sholars had medial and lateral joint line
tenderness in both knees and patellofemoral grind. *Id.* Dr. Navid prescribed Mobic for the
pain, gave and suggested she undergo a series of joint cortisone injections. (Tr. 502-03).
On April 23, 2011, an MRI of the right knee showed moderate degenerative disease,
worse in the lateral compartment, chronic appearing tear of the lateral meniscus anterior
horn, and small joint effusion. (Tr. 509). An MRI of the left knee, showed no acute
findings and mild early degenerative changes. (Tr. 510).

On April 27, 2011, Albert Fenoy, M.D., observed that Sholars had normal rapid
alternating movements, intact coordination, and full strength in her upper and lower
extremities. (Tr. 256). Dr. Fenoy, also found decreased sensation over the left proximal

9

and distal arm extending to her hand proximally compared to that over the right. *Id.*
Sholars complained of right finger numbness, but it was not seen on her exam. *Id.*
Sholars' reflexes were +1 and the Spurling maneuver to the right did produce some pain
in her left shoulder. (Tr. 256-257). Sholars' Tinnel and Phalen signs were both negative.
(Tr. 257). Sholars was also able to walk without an antalgic gait. *Id.* Dr. Fenoy indicated
that Sholars was a candidate for cervical spine surgery, but she did not want to be taken
off her Meloxicam for knee pain, which was necessary to be able to have the surgery. *Id.*

From April 21 to August 5, 2011 Sholars attended physical therapy sessions for
her neck and knees. (Tr. 266-308). On May 20, 2011, Sholars underwent a right knee
arthroplasty to relieve pain caused by her severe arthritis (Tr. 272) Sholars' symptoms
improved up to her final physical therapy session. (Tr. 294-308). On August 5, 2011,
Sholars' final session, the physical therapist assessed that Sholars had some increased
tingling on the left hand with chin tuck, but it went away when stopped the chin tucks.
(Tr. 308). She also noted that Sholars showed no complaint of pain or tingling and
recommended continued physical therapy. *Id.*

On June 9, 2011, Edward Murphy, M.D., noted that Sholars, as a result of a car
accident, has had pain for many months. (Tr. 321). Despite the accident, she was able to
get out of the car, walk around, and go home. *Id.* He also noted that the mobility in her
neck is 90% of normal, she has tightness in her paraspinous muscles, upper extremities
show good strength, tone, coordination, and normal reflexes. *Id.* The progress note shows
no myelopathy, no radiculopathy, and the reflexes on her lower extremities are
satisfactory. *Id.* Furthermore, an MRI taken of C4-C5 showed a protruding disc with

some encroachment on the front of the spinal cord and degenerative changes at other levels also. *Id.*

On August 25, 2011, about three months after the procedure on her right knee she saw Dr. Navid for a follow-up. (Tr. 496). Dr. Navid observed some joint line tenderness, but her McMurray's test was negative and she had a full range of motion and distal neurovascular statuses were intact. *Id.* He also noted that, overall, she was about 50% improved from before surgery, but experienced increased pain from the fall. *Id.*

An EMG from September 21, 2011, showed early carpal tunnel syndrome (right side greater than left) with some early degenerative potential in C5-C6 area. (Tr. 336). The motor unit potentials and recruitment patterns were grossly within normal limits. *Id.* Distal musculature in C5 enervation shows some irritation phenomenon bilaterally. *Id.* On May 10, 2012, Dr. Navid observed palpable tenderness over the iliotibital band starting proximal to the knee extending all the way to the gluteus tubercle. (Tr. 495). He also noted Sholars had some discomfort with the range of motion testing particularly with valgus stress. *Id.* Her right knee revealed some lateral motion greater than medial joint line tenderness against some grinding with range of motion. *Id.* Her distal pulses were intact bilaterally and the cruciate and collateral ligaments appear to be stable in both knees. *Id.* Dr. Navid injected the most tender area with a combination of dexamethasone and lidocaine. *Id.* He prescribed her anti-inflammatories with Mobic and Tramadol for pain control. *Id.* On June 13, 2012, Dr. Navid, again injected the right knee. (Tr. 494). On July 25, 2012, Dr. Navid noticed some mild effusion and joint line tenderness. (Tr. 492). Sholars had full flexion and extension, stable cruciate and collateral ligaments, and her distal neurovascular status was intact. *Id.* Dr. Navid was unable to administer any

injections due to Sholars' insurance no longer covering them. (Tr. 492). In place, Dr. Navid gave her a prescription for a patellar stabilizing brace, and prescribed her anti-inflammatories, and re-filled her prescription for Tramadol. *Id.*

On August 14, 2012, Sholars went to Dr. Farzana Sahi, M.D., for a consultative examination. (Tr. 514). Sholars' chief complaint was her neck and knee problems. (Tr. 514). Sholars described her pain as dull and located in the upper and lower back with no radiation. *Id.* Sholars also told Dr. Sahi that she was able to walk a block and stand for 10 minutes to an hour, lift up to 10 pounds, and bend. *Id.* After performing a physical examination Dr. Sahi noted that there is no spine or costovertebral angle tenderness in Sholars' back, she could squat and arise from a squatting position, and could bend and touch her fingertips to within 3 inches of the floor without difficulty. (Tr. 516). Furthermore, her thoracic spine was non-tender, lumbar spine was neither tender nor spasmatic, her SLR was negative and her range of motion was normal. *Id.* Dr. Sahi noted that her knee was tender, crepitus was noted, and a decreased range of motion was noted in right more than left knee. *Id.* An x-ray of the L-spine was done that showed mild degenerative changes, but it was normal. *Id.* Also a right knee examination was done that showed advanced osteoarthritis. *Id.*

On September 17, 2012, Vincent Talosig, D.O., observed tenderness in the left peri-scapular area with some decreased sensation to pinprick in the right anterior foot. (Tr. 571-72). He noted that the right and left knee strength were normal, as well as the right and left ankle and foot strength. (Tr. 571). Dr. Talosig administered a trigger point injection for her back and prescribed Lyrica. (Tr. 572). On September 18, 2012, emergency room physician Shashikant Patil, M.D., observed mild tenderness to

palpitation and mildly limited range of motion in her cervical and lumbar spine. (Tr. 532). Sholars had 4/5 strength in her left bicep and left lower extremity, and decreased grip strength on the left compared with the right, with all other motor exam results normal (Tr. 533). Dr. Patil viewed an MRI of the cervical spine from March 30, 2011, that showed moderate bilateral neuroforaminal stenosis and a broad based disc protrusion and C4-C5 and a mild osteophyte with mild spinal stenosis and moderate left-sided neuroforaminal stenosis at C6-C7. (Tr. 583). Dr. Patil recommended a more current MRI of the C-spine and L-spine for further testing and that the patient needed additional testing to make a proper diagnosis. *Id.*

On March 13, 2013, Haissam Elzaim, M.D., observed some decreased range of motion in the left hip as well as mild effusion, crepitus, pain, and tenderness in the right knee and mild joint line tenderness to palpitation in the left knee. (Tr. 746). Dr. Elzaim administered an injection in the right knee. (Tr. 746).

On May 15, 2013, Dr. Navid observed tenderness and mild effusion in the right knee and pain with decreased range of motion in the left hip. (Tr. 648). A CT of the left hip showed moderate to severe left hip osteoarthritis with severe superior hip joint narrowing and mild osteoarthritis in the left sacroiliac joint. (Tr. 909). A CT of the right knee showed no definite joint effusion, mild to moderate tricompartmental osteoarthritis that was most pronounced at the patellofemoral and lateral compartments as well as mild narrowing of the lateral patellofemoral compartments. (Tr. 911)

On July 24, 2013, Sholars reported pain, numbness, and tingling in her hands to Dr. Navid. Dr. Navid's progress note reveals Sholars had positive carpal compression and positive elbow flexion symptoms in the ulnar region. (Tr. 907). Sholars also showed a

negative Tinel's at the elbows, good sensory and motor function distal, and a full range of motion of the hands, wrists, elbows, and shoulders. *Id.* Dr. Navid prescribed splints and anti-inflammatory for her wrists. *Id.* Dr. Navid noted that they were awaiting Sholars' EMG and MRI results, because her symptoms were not very consistent. *Id.*

On November 11, 2013, Dr. Talosig observed slightly decreased bilateral upper extremity strength and positive Phalen and nerve compression tests. (Tr. 928). An EMG study showed moderate chronic C6-C7 radiculopathy bilaterally, mild carpal tunnel syndrome, and neuropathies in the upper extremities. (Tr. 930). At the follow-up with Dr. Talosig, on November 25, 2013, Sholars reported back and hip pain. (Tr. 920). Dr. Talosig observed decreased neurological signs in the bilateral anterolateral calf, an antalgic gait with use of a cane, pain in the right buttock and sacroiliac joint, back pain with bilateral straight leg raising, +1 deep tendon reflexes in the Achilles tendons bilaterally, and pain with external and internal rotation of the left hip. (Tr. 923). Dr. Talosig stopped Tramadol, because it was not providing significant relief and prescribed baclofen and gabapentin. *Id.* On December 10, 2013, Dr. Talosig increased her gabapentin to 300 milligrams multiple times per day, continued baclofen and Tylenol, and instructed her to begin physical therapy. (Tr. 935).

On October 12, 2012. Sholars presented at the emergency room after passing out and lacerating her head upon falling. (Tr. 693). Emergency room physician Aries Bajoyo, M.D., observed acute onset vertigo when she attempted to stand in the hospital, but otherwise her motor strength and sensory perception was intact. *Id.* A head CT showed a right frontal contusion and laceration with a few rare cerebral white matter foci, and greater right maxillary sinus opacification that could reflect inspissation, fungal disease,

or hemorrhage. (Tr. 627). Sholars again reported dizziness on March 28, 2013. (Tr. 670). On July 24, 2013, Sholars presented with dizziness and syncope with two observed episodes occurring at her orthopedist's office. (Tr. 767). On October 23, 2013, emergency room staff noted Sholars had an episode in the hospital where her blood pressure dropped and then resolved after about a minute. (Tr. 851). She reported she did not have money to go to her physician to get refills of her blood pressure medication. (Tr. 853).

Sholars also received treatment for a deviated septum and maxillary sinus disease from April 2, 2013 to August 22, 2013. (Tr. 594, 592, 608, 611-12, 622-23, 640, 657, 687, 872). Objective imaging showed significant right maxillary sinus disease that caused symptoms such as ear pain, dizziness, headaches, swelling, and tenderness. (Tr. 600, 604, 611, 620, 657). She underwent a deviated septum surgery on June 6, 2013. (Tr. 872). On June 12, 2013, James O'Neal, M.D., removed her septal splints and prescribed Vicodin for her sinus pain. (Tr. 604). On July 23, 2013, Dr. O'Neal noted her sinus symptoms persisted despite treatment. (Tr. 749).

On September 13, 2013, Dr. O'Neal opined that, due to her sinusitis, Sholars would frequently experience symptoms severe enough to interfere with her attention and concentration for simple, work-related tasks, would need to lie down or recline in excess of typical work breaks, and would likely be absent from work more than four times per month. (Tr. 789-90). Dr. O'Neal noted Sholars' sinusitis caused dizziness, right facial pain, and bilateral ear pressure. (Tr. 789).

Here, substantial evidence supports the ALJ's finding that Sholars' degenerative joint disease in the right knee, osteoarthritis of the left hip, cervicalgia, carpal tunnel

syndrome, and obesity were severe impairments at step two, and that such impairments of

Sholars', asthma, sinusitis, stroke, and headaches, were not severe impairments. At step

three, individually or in combination did not meet or equal a listed impairment. In

addition, substantial evidence supports the ALJ's RFC determination. The ALJ carefully

considered all of the record in formulating an RFC that addressed Sholars' impairments.

The ALJ's RFC determination is consistent with the record as a whole. This factor

weighs in favor of the ALJ's decision. The objective medical evidence therefore supports

the ALJ's decision.

### b. The Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating

and examining physicians on subsidiary questions of fact.  The law is clear that "a

treating physician's opinion on the nature and severity of a patient's impairment will be

given controlling weight if it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with... other substantial

evidence." *Newton,* 209 F.3d at 455. The ALJ may give little or no weight to a treating

source's opinion, however, if good caused is shown. *Id.* at 455-56. The Fifth Circuit in

*Newton* described good cause as where the treating physician's evidence is conclusory, is

unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is

otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence

from a treating or examining physician controverting the claimant's treating specialist,

and ALJ may reject the opinion of the treating physician only if the ALJ performs a

detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R.

§404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before

giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton,* 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and "where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *see also Alejandro v. Barnhart,* 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez,* 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *See also Cole v. Barnhart,* 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision of the grounds which he stated for doing so.") However, perfection in administrative proceedings is not required. *See Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir. 1988).

In this case, the ALJ thoroughly considered the medical records and testimony, and his determination reflects those findings accurately. There are several medical opinions in the record, including the opinions of Sholars' treating physician, Dr. O'Neal, the opinions of disability determinants who reviewed Sholars' medical records, Dr.

Andrea Fritz and Dr. Kevin Samartunga, and the opinion of a physician who consultatively examined Sholars, Dr. Sahi. The ALJ gave greater weight to the State Agency Medical Consultants and consultative examiner and discarded Dr. O'Neal's functional assessment. The ALJ found it was not consistent with his treatment records. (Tr. 17).

Sholars argues that the evidence does not support the ALJ's rejection of Dr. O'Neal's opinion. However, the ALJ gave specific reasons for rejecting Dr. O'Neal's opinion. The ALJ found that the "opinion mentioned only sinusitis, [but] the claimant testified that her knee and hip pain were the primary limitations." (Tr. 17). Dr. O'Neal only discussed the sinusitis and was unable to even touch on the musculoskeletal impairments that were the basis of Sholars' disability complaint. For example, when asked about his patient's "functional limitations if [his] patient were placed in a competitive work situation on an ongoing basis," Dr. O'Neal refrained from filling out the section and wrote "unsure" on the left hand side of the Questionnaire. (Tr. 789). Also, when asked how many pounds Sholars could lift and carry in a competitive work situation, he did not fill out the section, but wrote "no restrictions" on the right-hand side of the Questionnaire. (Tr. 790).

Second, even if the ALJ had given weight to Dr. O'Neal's opinion, the conclusion reached on his Questionnaire had little supporting evidence given that he was unable to fill out the majority of questions. The ALJ wrote:

> A treating physician opined that the claimant would be unable to maintain a 40-hour work week due to sinusitis in September 2013. Yet the opinion, which was conveyed on a pre-printed form provided by the claimant's attorney, did not reflect any exertional limitations and did not setup any foundation for the broad and sweeping conclusion of an inability to work.

(Tr. 17). "Statements that are brief and conclusory provide good cause for declining to follow a treating physician's opinion." *Legget,* 67 F.3d at 566. Furthermore, "questionnaire" format typifies "brief or conclusory" testimony, which is what Dr. O'Neal provided. *Foster v. Astrue*, 410 Fed. Appx. 831, 833 (5th Cir. 2011) (unpublished).

Third, the ALJ determined that Dr. O'Neal's opinion "was inconsistent with the treatment records in terms of symptoms and severity of sinus problems and did not even reference musculoskeletal issues. (Tr. 17). The record shows that Sholars received treatment from Dr. O'Neal from October 2012 to July 2013, primarily for sinus problems. (Tr. 585-628). The ALJ noted that in September 2012 Sholars "denied chronic sinus problems" and in October of that same year the record shows evidence that Sholars had a normal respiratory examination. (Tr. 13, 576). The ALJ then observed that after a diagnostic CT scan was performed in April 2013 that Sholars had only a mild abnormality. (Tr. 13, 610-11).

Sholars underwent a consultative physical examination performed by Dr. Sahi on August 14, 2012. (Tr. 512-522). Sholars' chief complaint was neck and knee problems. (Tr. 514).  Based on the exam, Dr. Sahi opined that Sholars was able to sit for a long period of time, stand and walk for short distances, and able to do moderate lifting. (Tr. 517).

Two state agency medical consultants, Dr. Andrea Fritz and Dr. Kevin Samartunga made RFC determination. They observed the medical records as a whole in reaching their decisions on her abilities and RFC.  "State agency medical and psychological consultants are highly qualified physicians and psychologists who are

experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P (July 2, 1996). The ALJ gave these consultants great weight based on the record as a whole and their qualifications.  On September 6, 2012, Dr. Andrea Fritz opined that while Sholars did have exertional limitations based upon her knee impairment she was able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total or 4 hours, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and push and or pull and unlimited amount. (Tr. 78). Dr. Fritz further opined that Sholars had postural limits, but is able to climb stairs and ramps occasionally, climb ladders, ropes, and scaffolds never, her balance and stooping is unlimited, and she can kneel, crouch, and crawl occasionally. *Id.* Dr. Fritz also found that Sholars had manipulative limitations. (Tr. 79). Sholars' reaching in any direction, including overhead, was found to be limited, but her handling, fingering, and feeling abilities were unlimited. *Id.* Sholars had no visual, communicative, or environmental limitations Dr. Fritz additionally explained:

> Medical Evidence of Record ("MEOR") indicates claimant has mild degenerative changes in her L-spine and advanced osteoarthritis of the right knee (imaging at CE on 8/14/12). Claimant had no muscle weakness and no atrophy. Her gait was normal and she was able to heel toe walk, but with difficulty. Straight-leg-raising test ("SLR") was negative. Claimant had no edema, although her knee was tender and crepitus was noted. Claimant had decrease range of motion ("ROM") in her left knee. Claimant was able to squat and rise from a standing position and bend to touch her fingertips within 3 inches of the floor without difficulty. Examination of claimant's neck showed no carotid bruits, no jugular venous distension ("JVD") and no masses or adenopathy.

> [On] 5/11 [the] claimant underwent arthroscopy [on her] right knee. Follow up ("F/U") reveals little improvement in pain. X-ray confirms degenerative joint disease ("djd"). Claimant provided MER from 7/25/12, which stated claimant was referred to physical therapist ("PT") but has not gone and therefore her pain is unchanged. Claimant was noted to have full flexion and extension and her collateral ligament were stable. Claimant was prescribed ("rx") a patellar stabilizing brace. C-spine MRI shows diffuse Degenerative Disc Disease ("DDD") with multilevel stenosis.

Claimant had a nerve condition study done (9/21/11) with results C5-6 radiculopathy. [On] 4/11 NSG exam shows normal ("nl") upper extremity ("ue") strength, decreased ("dec") sensation over the left ue, nl reflexes, claimant underwent minimal PT with minimal improvement.

Claimant mentions numbness in her hands in her ADL's but there is not MEOR showing a history ("hx") of therapy ("tx") for this allegation and this was not alleged to the CEP on 8/14/12.

The CEP indicated claimant reported she is able to walk a block and stand for 10 minutes to an hour, lift 10 pounds and bend. Claimant's ADL's state she is able to walk for 20 feet. However, this is inconsistent with further statements in her ADL's stating she feeds animals, vacuums, does laundry, cares for and feeds children meals, gets children dressed and makes beds. Claimant also states she does yard work, including raking. The alleged limitations are partially supported by the MEOR.

(Tr. 79)

On September 28, 2012, Dr. Samartunga reached the same conclusions about Sholars' exertional, postural, manipulative limitations. (Tr. 92-93). Additionally he reached the same conclusion that Sholars had no visual, communicative, or environmental limitations. (Tr. 93). Dr. Samartunga additional explanations mirrored that of Dr. Fritz. (Tr. 93).

The ALJ's reliance on the opinion of Dr. Fritz, Dr. Samartunga, and Dr. Sahi is supported by evidence in the record. The ALJ did not err in rejecting the brief, conclusory opinion of Dr. O'Neal, when his treatment records did not support it. The ALJ also did not err in giving the most weight to the opinions of Dr. Fritz, Dr. Samartunga, and Dr. Sahi, which support his RFC determination. (Tr. 21-27). The diagnosis and expert opinion factor also supports the ALJ's decision.

### c. Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability; this includes the claimant's testimony and corroboration by family and friends. Not all pain is

21

disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1884, 42 U.S.C. §423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment, which could reasonably be expected to cause the pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. §423. "Pain constitute[s] a disabling condition under the act only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders,* 914 F.2d at 618-19 (citing *Harrell v. Bowen,* 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment, which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33,35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. It should also be noted that individuals capable of performing even light or sedentary work, despite back trouble, are not disabled under the Act. *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983).

Sholars testified at the hearing before the ALJ that on December 12, 2013, in order to shed light on her claimed impairments. (Tr. 40-65). Sholars reported that injuries from a car wreck in December 2010 created new medical issues and made previous medical issues worse. (Tr. 51). Sholars testified that the primary thing keeping her from working is that her left hip needs to be replaced. (Tr. 51). Sholars testified she was told

by her orthopedic doctor her right knee "looks like its an 80 year old person's knee" and suggested injections but since her insurance doesn't cover them and they are $1,000.00 each she has to have three in weekly intervals. (Tr. 53). When the ALJ inquired into the option of weight loss to relieve some pain, Sholars replied that she began to lose weight (going from 270 lbs. to 198 lbs.), but her ailments have kept her from doing anything such as walking and she is gaining the weight back. *Id.*

Sholars also reported that the injuries that she received from the car wreck were in her neck and lower back areas. (Tr. 54). Sholars began physical therapy for her neck and completed six weeks worth, but hasn't been back in two years. (Tr. 55) Sholars also testified that she had not had neck surgery for fear of being permanently paralyzed, not being able to drive during recovery, and there is no guaranteed outcome. (Tr. 55-56). Sholars testified she uses a cane she borrowed from her sister. (Tr. 54). A physician did not prescribe it. (Tr. 55).

Sholars testified that she also began to have chest pains, but the echocardiogram showed normal results. (Tr. 56). Sholars testified that she has an extreme amount of trouble remembering things and coming up with words at the right time, an issue she's never had a problem with before. (Tr. 56-57). Sholars also testified that she has experienced trouble with lifting, balance, and carrying heavy things. (Tr. 57). She can no longer lift a basket of clothes anymore, but can sit at a table and fold the clothes. *Id.* Sholars testified she cannot sit for long periods of time due to the pain in her hip. (Tr. 58). She claims she would have to stand up to relieve the pain, and spends most of her time lying down to take the pressure off. *Id.* Sholars testified that she has no mental health issues and is on no psychological drugs. (Tr. 59). She listed certain medications

which included: Lisinopril, Amlodipine (for high blood pressure), Gabapentin and Baclofen (for the pain and muscle spasms), Aspirin, and Dexilan (for severe indigestion and heartburn). (Tr. 60-61).

Sholars testified that she was part of a nerve study showing that she had some radiculopathy in her hands that cause numbness and tingling all the time. (Tr. 61). It is constant in both hands, more in the left than the right, and she is right-handed. *Id.* Due to these nerve problems, Sholars stated that on a daily basis she can no longer open jars or bottles, she'll be carrying something and just drop it. (Tr. 61-62). Sholars claims that she can only sit for about 15 minutes before she has to shift a position or stand up and hobble around for a little bit then sit back down. (Tr. 62). Sholars reported that she cannot feed her dogs anymore because leaning over and looking down at the food container puts her off balance. *Id.* There is also an issue with feeding her horses because she has difficulty scooping food out for them. *Id.* Furthermore, Sholars stated her yard now has leaves and [tree] limbs all over it that she can no longer pick up. *Id.* Sholars also testified that she cannot put on her own socks or underwear and that her daughters have to help her most mornings. (Tr. 62-63). Sholars claims that she has more trouble focusing and no longer watches TV or reads because she loses her train of thought. (Tr. 63). She claims that she does not sleep very well at night and gets maybe 5 hours of sleep because her arms have gone numb and she needs to reposition herself. *Id.*

Sholars also testified that she has a lot of sinus infections, for which she has had a procedure done. (Tr. 64-65). Sholars claims that her sinus issues cause her to have headaches at least every other day, affecting different spots in her head, that last anywhere from 2 to 6 hours. *Id.* To deal with these headaches, Sholars puts a wet cloth

over her forehead or something wet on the back of her neck and has to lay down a lot of the time. (Tr. 64-65).

The ALJ found Sholars' complaints and subjective symptoms not entirely credible. In doing so, the ALJ wrote:

> While her medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.
>
> Despite a later diagnosis of carpal tunnel syndrome, the claimant had a negative Phalen's and Tinnel's sign in June 2012 (Exhibit 1-F, page 3). This is consistent with a diagnostic nerve conduction study performed in September 2011, which was relatively normal but did show early signs of carpal tunnel syndrome (Exhibit 5-F, pages 3-4). July 2013 clinical evaluation showed good sensory and motor function with a full range of motion of the hands and no indication of much limitation clinically (Exhibit 25-F, page 3) In fact, the examiner found that the claimant's complaint of neuropathy in her upper extremities was of "questionable etiology" after clinical evaluation (Exhibit 25-F, page 3). The etiology still unknown in November 2013 as EMG showed only mild carpal tunnel syndrome without cubital tunnel issues (Exhibit 26-F, pages 8 and 13). More limiting carpal tunnel syndrome would be expected to be accompanied with positive findings on clinical tests as well as significant abnormality on diagnostic testing. Nevertheless, the limitation against constant gross handling and fine fingering is consistent with the evidence.
>
> In terms of musculoskeletal problems, the evidence as a whole is inconsistent with the severity of the symptoms alleged. A March 2011 diagnostic MRI of the claimant's cervical spine showed disc degeneration with some stenosis at the C4-C7 levels but none of it was severe and it was noted to be acute rather than chronic (Exhibits 1-F, page 3; and 6-F, pages 10-11). A subsequent October 2012 cervical MRI made similar findings (Exhibit 23-F, page 50). As well as, radiculopathy at C4-C5 was found based on a September 2011 EMG study (Exhibit 16-F, page 5). Surgery was discussed in March 2011 but nothing ever happened with it and the claimant testified that she does not intend to have surgery (Exhibit 1-F, page 3). The claimant made complaints of shooting neck pain in August 2011 and referenced a lawsuit involving the December 2010 car accident (Exhibit 4-F, page 2). Despite neck and back pain in September 2012 the claimant had only mildly limited range of motion in her cervical and lumbar spine (Exhibit 10-F, pages 8 and 10). Earlier that month, the claimant indicated that her back pain was not significant (Exhibit 12-F, page 5).
>
> The claimant showed full range of motion in her neck in March 2013 (Exhibit 14-F, page 43). No complaints of neck pain in March 2013 despite treatment for

musculoskeletal issues (Exhibit 18-F, pages 2-3). As well, she denied neck pain and back pain in October 2013 (Exhibit 23-F, page 14). Moreover the claimant had full range of motion in her back at the time without pain (Exhibit 23-F, page 16). An October 2012 MRI of the claimant's back showed only minimal disc protrusions with no evidence of spinal or neuroforaminal stenosis (Exhibit 23-F, page 49). Further, the claimant had a normal back and neck examination during the consultative exam (Exhibit 9-F, pages 4-5). Greater limitation due to neck and back pain would be expected to be associated with consistent complaints of pain and consistently positive clinical findings. Additionally, it is inferred that if the claimant's neck problems were more debilitating, then she would pursue surgery.

The claimant had partial knee replacement in May 2011 but iliotibital band syndrome was diagnosed in July 2012 and degeneration in the claimant's knee was discussed (Exhibits 2-F, pages 4-5; and 8-F, page 1). At the time, the claimant was not following prescribed treatment in getting physical therapy and injections purportedly due to financial constraints (Exhibit 8-F, page 1). This is unfortunate since previous injections had provided relief (Exhibit 8-F, page 6). The claimant was able to walk without an antalgic gait on June 2012 clinical evaluation (Exhibit 1-F), pages 2-3). Additionally, the claimant's leg pain [was] only moderate in September 2012 and she showed normal gait at the time (Exhibit 12-F, pages 5 and 7). As well, the claimant denied joint pain in March 2013 (Exhibit F, page 43). However, degenerative joint disease of the right knee and left hip were found in May 2013 with x-rays showing degeneration (Exhibit 16-F, page 3). Yet, after clinical evaluation, the physician noted that the claimant was not a good candidate for surgery (Exhibit 18-F, page 3). There were no complaints of joint pain in July 2013 and the claimant demonstrated steady gait at the time (Exhibits 19-F, page 4; and 20-F, page 11). She also showed normal gait in October 2013 (Exhibit 23-F, page 16). However, she was using a cane in November 2013 (Exhibit 26-F, page 6). After clinical evaluation, the consultative examiner found that the claimant could sit for long periods, do moderate lifting, stand normally, and walk short distances.

(Tr. 16-17) Sholars contends that the ALJ failed to assess or mention statements from Sholars' sister, daughter, and mother in his decision. The ALJ may reject lay witness testimony as subject to influence. *Harrell,* 862 F.2d at 482 ("objective findings are important to the disability determination because the observations of an individual, particularly a lay person, may be colored by sympathy for the affected relative or friend and influenced by that person's exaggeration of his limitation.") Therefore, the ALJ didn't abuse his discretion in not assessing the statements, especially in a situation such

as here, where the statements were cumulative of Scholars' testimony and Function Report.

Sholars argues that the credibility determination by the ALJ is not supported by substantial evidence. Credibility determinations, such as made by the ALJ in connection with Sholars' testimony about her limitations, are within the province of the ALJ to make. *See Greenspan*, 38 F.3d at 237 ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), cert. denied, 514 U.S. 1120 (1995).  Because the ALJ made and supported his credibility determination with references to medical evidence, physician testimony, and Sholars' testimony about her daily activities and function report, and because there is nothing in the record to suggest the ALJ made an improper credibility finding, or that he weighted the testimony improperly, the subjective evidence factor also weighs in favor of the ALJ's decision.

### d.  Educational Background, Work History and Present Age

The fourth element considered is the claimant's educational background, work history, and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423 (d)(2)(a).

The record shows that Sholars was 50 years old at the time of the administrative hearing, is a high school graduate, and has performed past relevant work as a data entry clerk. (Tr. 45-49). Sholars can read, write, and do basic arithmetic. (Tr. 49).

The ALJ presented a hypothetical question to the VE that included all supported limitations. (Tr. 65-66). This hypothetical question properly incorporated all of the limitations accepted as true by the ALJ. *See Roberts v. Colvin*, 946 F. Supp. 2d 646, 662 (S.D. Tex. 2013) ("An ALJ is not required to incorporate limitations into the hypothetical questions presented to the VE, if the ALJ did not find the alleged limitations to be supported in the record.") "A vocational expert is called to testify because of his familiarity with job requirements working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughn v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Here, the ALJ relied on a comprehensive hypothetical question to the VE. Substantial evidence supports the ALJ's conclusion that Sholars could perform work as a data entry clerk. The court concluded that the ALJ's reliance on the vocational testimony was proper. Thus, this factor also weighs in favor of the ALJ's decision.

## VI.    Conclusion and Order

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guideline propounded by the Social Security

Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982).  As all the relevant factors weigh in support of the ALJ's decision, and as the ALJ used the correct legal standards, the Court ORDERS that the Defendant's Motion for Summary Judgment (Document Nos. 15) is GRANTED, that Plaintiff's Motion for Summary Judgment (Document Nos. 16) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this _____ day of _____, 2016

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE